2001 WY 118

**STATE of Wyoming, DIVISION OF CHILD SUPPORT ENFORCEMENT, State of Wyoming ex rel., NDB, Minor Child.**

**RWR, Appellant (Respondent),**

**v.**

**EKB and JDB, Appellees (Respondents).**

No. C–00–13.

Supreme Court of Wyoming.

Dec. 7, 2001.

Patrick F. Crow of Law Office of Patrick F. Crow, Newcastle, WY. Argument by Mr. Crow, Representing Appellant.

Gay Woodhouse, Attorney General; Michael L. Hubbard, Deputy Attorney General; Dan S. Wilde, Senior Assistant Attorney General; and Peggy A. Trent, Assistant Attorney General. Argument by Mr. Wilde, Representing Appellee State of Wyoming, Division of Child Support Enforcement.

No appearance, Representing Appellee EKB.

Daniel B. Bailey of Lubnau, Bailey & Dumbrill, PC, Gillette, WY, Argument by Mr. Bailey, Representing Appellee JDB.

Kathryn J. Edelman, Gillette, WY, Guardian Ad Litem.

Before LEHMAN, C.J., and GOLDEN, HILL, KITE, and VOIGT, JJ.

HILL, Justice.

[¶ 1] The district court determined that RWR (hereafter "Father") was the biologic [1] father of NDB (hereafter "Child"). Father challenges that decision on a variety of grounds. The other parties to this appeal are the State of Wyoming, Division of Child Support Enforcement (State), Child's Mother, EKB (hereafter "Mother"), and JDB, who was married to Child's Mother at the time of Child's birth.

[¶ 2] We will affirm.

## ISSUES

[¶ 3] Father raises these issues:

1) Did the District Court err when it ruled it was not required by the Wyoming Par-

---

1. The phrase, "biologic father," is used as a synonym for the somewhat less accurate phrase, "natural father," which is used in Wyo. Stat. Ann. § 14–2–102 (Michie 1997) *infra*.

entage Act to recognize the parentage determinations contained in a decree of divorce?

2) Did the District Court err in a paternity proceeding in which there were two men each of whom was a presumed father as defined in Wyoming Statutes Section 14–2–102(a) (LEXIS 1999), when it ordered the parties to submit to genetic testing?

3) Did the District Court err when it used genetic testing to determine the paternity of NDB [Child] rather than resolving conflicting presumptions of paternity as defined in Wyoming Statutes Section 14–2–102(a) (LEXIS 1999), by deciding which presumption is supported by weightier considerations of policy and logic?

4) Did the District Court violate the right of Appellant [Father] to be protected from unreasonable search and seizure when it ordered the taking of tissue samples for genetic testing and the introduction of reports of genetic tests made with those samples?

The State posits this issue for our determination:

I.  Did the Wyoming district court violate Appellant's [Father's] constitutional rights by ordering him to submit to genetic tests in its determination of NDB's [Child's] paternity?

JDB poses these issues:

A.  Is the minor child precluded by doctrines of *res judicata,* collateral estoppel or judicial estoppel from seeking a judicial determination of his biological father from among two statutorily presumed fathers?

B.  Where conflicting statutory presumptions exist, is the rebuttal of a single presumption dispositive?

C.  Does it matter who the biological father of the child is, or that a fraud was perpetrated on the Court to hide the Mother's pregnancy?

D.  Did the district court violate Appellant's [Father's] constitutional rights by ordering him to submit to genetic tests in its determination of NDB's [Child's] paternity?

## FACTS

[¶ 4]  Child was born on September 21, 1992, and from the date of his birth until July of 1998, all parties believed JDB was the biologic father of Child.  Mother was married to Father[2] at the time Child was conceived, but she believed Father to be incapable of producing a child because he had been diagnosed by a physician as having a low sperm count and low sperm motility.  For more than a year and a half Mother and Father attempted to become pregnant, but those efforts had **apparently** failed.  During the final months of her marriage to Father, Mother engaged in an affair with JDB, and when she discovered she was pregnant in January of 1992, she assumed Child's biologic father to be JDB.[3]  By decree entered on April 30, 1992, Mother was divorced from Father.  The parties reached a settlement that was appended to the divorce decree.  It contained this provision: "No children have been born to the parties during their marriage and no children are expected to be born as issue of this marriage."  Similar language is found in the divorce decree.

[¶ 5]  Mother was married to JDB on August 14, 1992.  JDB and Mother lived together as man and wife for about two and one-half years but were divorced by decree entered on September 1, 1995.  That decree contained this provision: "That one (1) child has been born as issue of this marriage of the parties, namely, [Child] born September 21, 1992."

[¶ 6]  After JDB and Mother were divorced, JDB continued to have some visitation with Child.  While Child was with JDB during the summer of 1998, JDB obtained a mail order DNA testing kit and sent in buccal swabs (saliva/tissue samples) from himself

---

2.  Father was married to Mother from May of 1987 through April of 1992.

3.  JDB shared that assumption, as did Father. Mother reached her assumption even though she used contraception during intercourse with JDB but not during intercourse with her husband. Mother was engaging in intercourse with both men during the time frame in which she conceived.

and Child for analysis. That test result eliminated JDB as the biologic father of Child.

[¶ 7] The instant litigation was initiated on December 9, 1998, when the State filed a petition to establish paternity on behalf of Child. Father questions the sincerity of the State's motivation in initiating this action. However, the record demonstrates that the State did so at Mother's request. On July 29, 1998, JDB had called Mother and told her that he was not the biologic father of Child and wanted to know who was. Mother decided to initiate this litigation because she wanted to know "the truth" and because JDB was insistent that it be done. After some preliminary proceedings, the district court ordered that genetic testing be done.[4] The district court entered that order reluctantly and stated in the order that he "could not veto the good faith decision of the guardian *ad litem*" to proceed with genetic testing. The genetic tests established that JDB could not be the biologic father of Child and that RWR was, indeed, his Father.

[¶ 8] The most perplexing hurdle in this very difficult case arises because Father did not want genetic testing done and, even after the test results were made available, he resisted efforts to establish the true paternity of Child. Father was unequivocal in stating that he did not desire to have a father-child relationship with Child. JDB, who had some semblance of a father-child relationship with Child, did not wish to continue that relationship unless Child initiated it. JDB contended that his relationship with Child was minimal because he had been absent from the home due to his work during much of the two and one-half years he was married to Mother. After his divorce from Mother, JDB had only limited visitation because Mother tended to interfere with his court-ordered visitation. To the extent there was visitation, it was JDB's sense that Child did not want to be with him and did not like him (thus, he did

not want to force Child to continue an unsatisfactory father-child relationship).

## INTRODUCTION

[¶ 9] Before we embark on a discussion designed to resolve the issues actually raised in this appeal, it is prudent that we clear some debris from the path we intend to follow in reaching our decision. Cases determining the paternity of children often present unique and perplexing fact situations, and this one is no exception. The issues to be decided are those set out in the "ISSUES" section above. In the course of presenting the germane arguments, many other issues are either explicitly or implicitly introduced into the mix, and given the circumstances of this case, we are constrained to mention those matters which have little or nothing to do with this case. Father summarizes his view of this case thus: "This case involves a decision by the district court which effectively shattered what was left of a family and forced a six-year-old boy to substitute a stranger for the father he had known all of his life." Quite the opposite is true. Mother, Father, and JDB shattered the family relationships that are the subject of this appeal and they then sought the aid of the courts in their attempt to put them back together again. The reality is that it simply will not go back together again, and neither the district court nor the State of Wyoming is responsible for those circumstances.

[¶ 10] The first misleading notion we must put aside is that of a concern for the legitimacy of Child. If anything, he has a surfeit of male parents insofar as legitimacy is concerned, and at no juncture has there been a threat that the result would be anything other than one that sustained his legitimacy. The very broaching of that issue was a disservice to Child, to the law, and it is an affront to intellectual honesty.

---

4. Throughout the proceedings the district court expressed its misgivings about and even hostility toward what the parties were doing, including the guardian ad litem (GAL), who was appointed by the district court. Although JDB did an informal genetic test, that test only eliminated him as the biologic father. Mother insisted on genetic testing, JDB insisted on genetic testing, and the

GAL favored genetic testing on behalf of Child. Only Father objected to the genetic tests. The parties rejected a settlement proposal that was offered by the district court to the effect that JDB would continue to pay child support and that Father would also pay child support into a trust for Child (the trust was not to be under the control of Mother).

[¶ 11] In this case, there is no prior proceeding in which Child was a party, so we have no concern with the principles of *res judicata,* collateral estoppel, judicial estoppel, or laches. *See Matter of Paternity of SDM,* 882 P.2d 1217, 1220–25 (Wyo.1994).

[¶ 12] Some concern has been expressed about a fraud on the district court in the divorce between Mother and Father. The facts most strongly suggest all parties genuinely believed the facts relating to Mother's pregnancy to be other than what they actually turned out to be upon microscopic scientific examination. In this appeal, we have neither the need nor the proper legal vehicle to resolve any concerns about a fraud upon the court.[5]

[¶ 13] We will discard any suggestion that the State should be scapegoated for the misdeeds of some of the principals in this litigation. The State filed this suit at the urging of Mother,[6] who acted at the insistence of JDB. The State filed the suit in accordance with law and because it is the entity upon whose shoulders the burden of litigation of this nature usually falls. *See State Department of Family Services, Division of Public Assistance and Social Services v. Peterson,* 960 P.2d 1022 (Wyo.1998). A guardian ad litem (GAL) was appointed by the district court. Mother, JDB, and the GAL all favored the use of genetic testing to resolve this case. The State took no position on that issue. Father resisted the use of genetic testing. Father's resistance is premised on a hypertechnical reading of the law but with knowledge that preliminary genetic testing eliminated JDB as the biologic father. The suggestion cannot be avoided that Father may have been motivated by a desire to avoid the financial obligation of child support, as well as the responsibilities of fatherhood.

[¶ 14] Father injects the "best interests of the child" at several junctures. There are some circumstances where the best interests of the child are at issue in a paternity proceeding. *TL ex. rel. TL v. CS,* 975 P.2d 1065, 1069 (Wyo.1999). However, much like the *TL* case, such an analysis was rendered unnecessary because the statute permitted this action and mandated genetic testing if requested by even one party. *Id.* Here, we do not have a circumstance where a biologic father seeks to disrupt an established father-child relationship. Instead, we have a presumptive father who seeks to dissolve what he contends is not an established and functional father-child relationship in favor of a man who has been determined to be the biologic father. Courts simply are not always capable of resolving the sorts of profound human dilemmas that are brought to their doorsteps, at least not in a way that will avoid all potential hardship to even innocent parties. Here, though Child has two presumptive fathers, he has none who wishes to fully embrace that role and the responsibility that goes with it. We cannot disagree with the position of Mother, JDB, and the GAL (as well as the reluctantly-reached decision of the district court) that "the truth" was the best result that could be salvaged in this case.[7]

## STANDARD OF REVIEW

[¶ 15] It is the Father's contention that the district court failed to properly construe the pertinent statutes in terms of how conflicting presumptions of paternity are to be resolved. Father's argument continues that JDB was a presumptive biologic father because he was married to Mother at the time of Child's birth, that JDB took Child into his home and he held Child out as his own, **and** that there was a divorce decree that established JDB as the biologic father. Continuing, Father contends that the district court should not have looked to the genetic

5. The same district judge presided in all pertinent cases the divorce of Mother and Father, the divorce of Mother and JDB, and the instant proceedings.

6. Mother was concerned with the continuation of child support payments.

7. A child's interests in an accurate paternity determination are broader than the interests of all others and include support, inheritance, and medical support. An accurate determination of paternity results in intangible, psychological, and emotional benefits for the child, including familial bonds and learning of cultural heritage. *Hall v. Lalli,* 194 Ariz. 54, 977 P.2d 776, 781 (Ariz. 1999).

testing provision in Wyo. Stat. Ann. § 14–2–109 (Michie 1997) because § 14–2–102 commanded that JDB be designated the biologic father. We do not agree with that analysis of the statutes.

[¶ 16] The standard of review to be applied to the first three issues raised by Father are those principles that pertain to the construction of statutes. In interpreting statutes, our primary consideration is to determine the legislature's intent. All statutes must be construed in *pari materia* and, in ascertaining the meaning of a given law, all statutes relating to the same subject or having the same general purpose must be considered and construed in harmony. Statutory construction is a question of law, so our standard of review is *de novo*. We begin by making an inquiry respecting the ordinary and obvious meaning of the words employed according to their arrangement and connection. We construe the statute as a whole, giving effect to every word, clause, and sentence, and we construe all parts of the statute in *pari materia. Fontaine v. Board of County Commissioners of Park County,* 4 P.3d 890, 894–95 (Wyo.2000) (and cases cited therein); and *see Wyoming Department of Transportation v. Haglund,* 982 P.2d 699, 701–3 (Wyo.1999); and *Richards v. Board of County Commissioners of Sweetwater County,* 6 P.3d 1251, 1253 (Wyo.2000).

[¶ 17] Wyo. Stat. Ann. § 14–2–102 (Michie 1997) [8] provides:

(a) A man is presumed to be the natural father of a child if:

(i) He and the child's natural mother are or have been married to each other and the child is born during the marriage, or within three hundred (300) days after the marriage is terminated by death, annulment or divorce or after a decree of separation is entered by a court;

. . . .

(iv) While the child is under the age of majority, he receives the child into his home and openly holds out the child as his natural child.

. . . .

(b) A presumption under subsection (a) of this section may be rebutted in an appropriate action only by clear and convincing evidence. If two (2) or more presumptions under subsection (a) of this section arise which conflict with each other, the presumption which on the facts is founded on the weightier considerations of policy and logic controls. A presumption under subsection (a) of this section is rebutted by a court decree establishing paternity of the child by another man.

[¶ 18] Under Wyo. Stat. Ann. § 14–2–102(a)(i), JDB was a presumed biologic father because Child was born during his marriage to Mother. Of course, under that same provision, Father was also a presumed biologic father because Child was born within 300 days of his divorce from Mother. Father also looks to § 14–2–102(a)(iv) as a basis for establishing JDB as the presumptive father. Father then contends that as contemplated by § 14–2–102(b), there were conflicting presumptions and, thus, the district court was required to apply the statutory language, "[a] presumption under subsection (a) of this section is rebutted by a court decree establishing paternity of the child by another man." It is Father's contention that his "presumed" paternity was rebutted by the decree dissolving the marriage between Mother and JDB because one of its provisions stated that Child was a product of that marriage.

[¶ 19] However, the district court did not follow that path, but instead ordered that genetic tests be performed upon the request of the Child's GAL, as well as other parties. Wyo. Stat. Ann. § 14–2–109 (Michie 1997) (emphasis added) provides:

(a) As used in W.S. 14–2–101 through 14–2–120:

(i) "Genetic markers" mean separate identifiable genes or complexes of genes generally isolated as a result of blood typing, at least seven (7) of which are normally tested in a paternity determination;

---

8. We apply the pertinent portions of the statutes in Title 14, Chapter 2, as they existed at the time this litigation was filed and resolved. Many of the statutes in Title 14, Chapter 2, have been substantively amended since this litigation was completed in the district court.

(ii) "Genetic tests" means blood or tissue typing tests including, but not limited to, tests of red cell antigens, red cell isoenzymes, human leukocyte antigens, serum proteins or deoxyribonucleic acid.

(b) **The court may, and upon request of a party shall, require the child, mother or alleged father to submit to genetic tests.** The tests shall be performed by an expert qualified as an examiner of genetic markers appointed by the court. The tests shall be of a type generally acknowledged as reliable by accreditation bodies designated by the United States secretary of health and human services and performed by a laboratory approved by such an accreditation body.

(c) The court, upon reasonable request of a party, shall order that independent tests be performed by other experts qualified as examiners of genetic markers. The party requesting the test shall be ordered by the court to pay for the test. Any objection to the results of a genetic test shall be made in writing not later than twenty (20) days after the results of the test are received by the person making the objection.

[¶ 20] As noted above, Father resisted all efforts to subject him to genetic tests based on his statutory construction theory set out above, as well as on constitutional grounds which we will discuss later. However, Father did not otherwise challenge the accuracy or reliability of the tests performed. *See* Wyo. Stat. Ann. § 14–2–109(e)(iv) (Michie 1997), and *TL*, 975 P.2d at 1068–69.

[¶ 21] In addition to those pivotal statutes set out above, this effort at statutory construction must take account of Wyo. Stat. Ann. § 14–2–101 (Michie 1997):

(a) As used in W.S. 14–2–101 through 14–2–120, "parent and child relationship" means the legal relationship existing between a child and his natural or adoptive parents incident to which the law confers or imposes rights, privileges, duties and obligations. It includes both the mother and child relationship and the father and child relationship and extends equally to every child and parent regardless of the marital status of the parents.

(b) The parent and child relationship may be established between a child and:

(i) The natural mother by proof of her having given birth to the child or as provided by W.S. 14–2–101 through 14–2–120;

(ii) The natural father as provided by W.S. 14–2–101 through 14–2–120;

(iii) An adoptive parent by proof of adoption.

[¶ 22] Not only do the principles of statutory construction tell us that we must read all of these statutes together (in *pari materia*), but the statute set out above says that same thing in virtually those same words. Section 14–2–102 sets out a list of presumptions that apply to the paternity equation, but § 14–2–109(b) allows, and in the instant circumstances where three of the five parties requested genetic testing, commands that genetic testing be carried out. We hold that the district court properly construed and applied the governing statutes under the circumstances of this case.

[¶ 23] Finally, Father contends that his being subjected to genetic testing was a constitutionally unreasonable search and seizure. Cogent argument or pertinent authority does not support this contention, and we will not consider it.[9] *Statezny v. State*, 2001 WY 22 ¶ 11, 18 P.3d 641, ¶ 11 (2001); *Eustice v. State*, 11 P.3d 897, 904 (Wyo.2000); *McLoughlin v. McLoughlin*, 996 P.2d 5, 8 (Wyo.2000).

[¶ 24] The dispositive order of the district court is affirmed in all respects.

GOLDEN, J., filed a specially concurring opinion, in which LEHMAN, C.J., joined.

GOLDEN, J., specially concurring, in which LEHMAN, C.J., joins.

[¶ 25] By this action, a man legally presumed to be the father of Child has been able to legally terminate his parental rights and

---

9. *In re Paternity of D.A.A.P.*, 117 Wis.2d 120, 344 N.W.2d 200, 204–5 (1983); *State on Behalf of Kremin v. Graham*, 318 N.W.2d 853, 855–56 (Minn.1982) (holding that genetic testing is not an unconstitutional invasion of the person or of a person's privacy).

obligations to Child. While I concur in the result, this case presents disturbing issues. The legal establishment of the non-existence of a parent-child relationship raises special public policy concerns. Questions arise as to who should be able to bring such an action, the timing of the action, and the process to be followed once the action is brought. Unfortunately, I cannot discern a clear policy in the current statutes on these issues.

[¶ 26] Initially, I wonder whether this case ever should have entered the judicial system.[1] The underlying case was originally brought by the Department of Family Services, ex rel Child, and titled "[p]etition for declaration of non-paternity and establishment of paternity and support." Although none of the parties raised the issue before this Court, I have a concern regarding the authority of the Department to bring an action to declare the non-paternity of a presumed, acknowledged, and adjudicated father (JDB).

[¶ 27] I have searched the applicable statutes and find the issue unclear and disturbing. Under the circumstances of this case, Title 14 clearly barred JDB, RWR and EKB from bringing an action setting aside the parent-child relationship between JDB and Child.[2] Title 20, chapter 6 contains the statutory grant of authority for the Child Support Enforcement Division of the Department to bring actions to establish paternity. The statutes seem to reflect that the child support enforcement agency only has an interest in making sure there is a father obligated to support a child. This child had such a father. I fear the Department overstepped its authority by bringing an action to disestablish paternity and, in the process, set itself up to be misused by parents wanting to disown their parental obligations well after they are barred from challenging a paternity determination in their own name. Although troubled by such an outcome, I must leave the conclusive answer to this inquiry for another day when the issue is squarely before this Court and supported by appropriate briefing.[3]

[¶ 28] In terms of process, it is clear that, under the statutes applicable to this case, the district court simply has no discretion regarding ordering genetic testing. Genetic testing was required to be ordered upon the request of any party. It seems the legislature has recently reviewed this issue since some of the pertinent statutory language within the paternity statute has been amended. While somewhat confusing, the language

---

1. The moral response to this inquiry can only be answered by the parties involved. In this instance, my concern is with the legal response.

2. See Wyo. Stat. Ann. § 14–2–104(a) and (c) (Lexis 1999) (amended 2000) that provide in pertinent part:
   (a) A child, his natural mother or a man presumed to be his father under W.S. 14–2–102(a)(i), (ii) or (iii) may bring action:
   (i) At any time for the purpose of declaring the existence of the father and child relationship presumed under W.S. 14–2–102(a)(i), (ii) or (iii); or
   (ii) To declare the nonexistence of the father and child relationship presumed under W.S. 14–2–102(a)(i), (ii) or (iii), provided:
   (A) The action is brought not later than three (3) years after the child reaches the age of majority if the action is brought by or on behalf of the child or by the department of family services;
   (B) The action is brought within a reasonable time after obtaining knowledge of relevant facts, but in no event later than five (5) years after the child's birth in all other cases;

   (C) After the presumption has been rebutted, paternity of the child by another man may be determined in the same action if he has been made a party.
   * * * *
   (c) * * * Any man alleging that he is the natural father of a child having a presumed father under W.S. 14–2–102 may, within six (6) months of the child's birth or on or before December 31, 1994, whichever is later, bring an action under this section to declare his paternity of the child and accordingly rebut the presumption of a father and child relationship between the child and the presumed father. . . .

3. I do note with interest that Wyo. Stat. Ann. § 20–6–104 has been amended effective July 1, 2000. This statute, entitled "[c]hild support enforcement services generally," provides that the services provided by the DFS now include "[t]he establishment of paternity for out of wedlock children pursuant to W.S. 14–2–101 et seq." Wyo. Stat. Ann. § 20–6–104(a)(viii) (LexisNexis 2001).

of Wyo. Stat. Ann. § 14–2–109 now seems to suggest that ordering genetic testing may be discretionary with the district court.[4] This discretion is limited, however, by language in Wyo. Stat. Ann. § 14–2–110(a)(iv) (LexisNexis 2001) that states: "[i]f a man has been identified as a possible father of the child, the court may and upon request of a party shall require the child, the mother or the man to submit to appropriate tests." Thus, even under the new statute, the ordering of genetic testing remains mandatory under certain circumstances. Even should circumstances arise where the ordering of genetic testing might be discretionary, the legislature offers no guidance for the courts on what factors to consider in exercising such discretion.

[¶ 29] These are only a few of the issues raised by this case. The legal system certainly cannot bring love into a family, but it should at least provide a clear and coherent process when called upon to define a family. This is especially true when the legal system is used to disestablish paternity. Such an action has severe consequences for the family (most importantly the child) and raises serious questions of public policy. The legislature is, of course, the proper body to set such public policy. The questions arising from the current statutory framework suggest that perhaps it would be appropriate for the legislature to comprehensively review that framework to resolve any ambiguities and ensure it accurately codifies legislative policy determinations.

---

4. "Notwithstanding subsections (a) through (d) of this section, the court or the department of family services may require the child, mother or alleged father to submit to genetic tests for the purpose of establishing paternity. ...." Wyo. Stat. Ann. § 14–2–109(g) (LexisNexis 2001).